IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES DAWSON                          :
                                        :          CIVIL ACTION
            v.                          :
                                        :          NO. 10-5948
DARBY BOROUGH                           :

SURRICK, J.                                         JANUARY  13 , 2012

### MEMORANDUM

Presently before the Court is Defendant Darby Borough's Motion for Summary

Judgment.  (ECF No. 11.)  For the following reasons, the Motion will be granted.

I.      BACKGROUND

Plaintiff Charles Dawson is a high school graduate.  (Dawson Dep. 66, Pl.'s Resp. Ex. A,

ECF No. 12.)  Since graduating from high school, Plaintiff has held several manual labor jobs,

including working as a detail person for a car dealership, a security person for a department store,

a shipping receiver, a forklift operator and a laborer.  (*Id.* at 66-67.)  Plaintiff graduated from the

Police Academy in 1993.  (*Id.* at 67.)  In 1994, Plaintiff joined the Darby Borough Police

Department as a police officer.  (*Id.*)  Plaintiff has been a member of Lodge No. 27 since 1998,

the year he became a full-time police officer.  (*Id.* at 6.)  Other than his training at the Police

Academy, Plaintiff has had no formal training or education since graduating from high school.

(*Id.* at 66, 68.)

In 2001, Plaintiff's vision became blurry while operating his police vehicle.  Plaintiff

pulled over and sat in the vehicle until he regained clear vision.  He then returned to the police

station, where he announced that he was experiencing vision problems.  Plaintiff was

subsequently admitted to a hospital where he was diagnosed with diabetes.  (*Id.* at 72-74.)  From 2001 to 2007, Plaintiff did not experience problems in performing his job as a police officer as a result of the diabetes, although he experienced some symptoms stemming from the disease.  (*Id.* at 74.)

In August 2007, Plaintiff became sick and was admitted to a hospital where he remained in a coma for five days.  His illness was a result of contracting Rocky Mountain Fever and his underlying condition of diabetes.  (*Id.* at 10.)  Defendant knew, prior to August 2007, that Plaintiff suffered from diabetes.  (*Id.* at 17.)

Plaintiff returned to work in January 2008.  (*Id.* at 10-11.)  He was still recovering from the illness and getting his strength back.  (*Id.* at 11.)  He had his diabetes "under control" by taking medication, and was placed on desk duty, rather than his normal duties as a patrol officer.  (*Id.* at 11-13.)[1]  While on desk duty, Plaintiff worked forty hours per week, did not have any problems with the work and did not have any disciplinary issues.  (Dawson Dep. 14-15, 20.)[2]

Plaintiff returned to patrol duty in June 2008.  (Dawson Dep. 14.)  Upon his return,

--------

[1] Defendant placed Plaintiff on desk duty because he was running out of his allotted sick days.  Plaintiff had been released by a doctor for "light duty."  Since light duty was not available at the time, Defendant provided Plaintiff with a temporary job answering phones, doing paperwork and monitoring prisoners until his physician authorized him to return to his regular patrol duties.  (Smythe Dep. 17-18, Def.'s Mot. Ex. G, ECF No. 11.)

[2] Defendant contends that after Plaintiff's hospitalization in August 2007, he had difficulties keeping his blood sugar under control, which he openly discussed with the Police Department.  Defendant also contends that while on desk duty, Plaintiff frequently fell asleep and would tell other officers that he was tired.  (Smythe Dep. 22-23, 30.)  However, while on desk duty, Plaintiff was never disciplined for coming to work late or falling asleep at the job.  (Pl.'s Resp. ¶ 40; *see also* Dawson Dep. 20.)  For purposes of this Motion, we assume that Plaintiff controlled his diabetes with medication and did not have any problems or disciplinary issues while on desk duty.

Plaintiff had no problem controlling his diabetes with medication, although he did have physical symptoms stemming from diabetes, such as "little tingles in [his] fingers." (*Id.* at 17, 19.) While on patrol duty, Plaintiff was disciplined on two occasions. (*Id.* at 22.)

The first occasion occurred on June 24, 2008. (July 11 Reprim. Ltr, Def.'s Mot. Ex. H.) Plaintiff was assisting another officer in pursuing an ATV. While on his way to assist the officer, Plaintiff entered an intersection, and the ATV darted out in front of him. Plaintiff slammed on his brakes to avoid striking the ATV. As Plaintiff slid through the intersection, his vehicle was struck by the police vehicle that was pursuing the ATV. (Dawson Dep. 22-23.) No one involved in the collision was seriously injured. (Dawson Dep. 24; Smythe Dep. 21.) Plaintiff did not lose consciousness and was not incoherent at the time of this incident. (Gevers Ltr. 2, Def.'s Mot. Ex. O.)[3]

The second occasion arose on July 25, 2008, when Plaintiff was transporting a prisoner to the police station. (Gevers Ltr. 2; Dawson Dep. 22.) Plaintiff began having severe pain in his sinus area. (Gevers Ltr. 2.) As Plaintiff approached an intersection, another vehicle came from

---

[3] Defendant has a different account of this incident. Robert F. Smythe, Sr., Chief of Police, testified that as the officer in pursuit of the ATV was approaching the intersection, Plaintiff and Police Lieutenant Gibney also were approaching. Gibney was in front of Plaintiff. Gibney pulled over because he heard on the police radio transmitter that the pursuing officer and the ATV were approaching the intersection and wanted to avoid entering it. Plaintiff went around Gibney, entered the intersection and hit the pursuing officer's vehicle, causing extensive damage to the vehicle. (Def.'s Mot. ¶ 38; *see also* Smythe Dep. 20-21; Guy Dep. 10-11, Def.'s Mot. Ex. K.) Police Lieutenant Darrell Guy testified that he did not believe that this accident was a result of Plaintiff's diabetes. (Guy Dep. 15.)

According to Defendant, Plaintiff was "out of sorts" after the collision. When questioned by Gibney, Plaintiff said he never heard the radio transmission that the officer pursuing the ATV was entering the intersection. This, in addition to Plaintiff's failure to stop at the intersection after Gibney had pulled over directly in front of him, left Smythe with the impression that Plaintiff was having some sort of problem with keeping his sugar under control. (Smythe Dep. 21-22.) Plaintiff disputes Defendant's account.

the opposite direction and "was so far over that [Plaintiff] moved over and . . . tapped the mirror on the car that was parked on the right-hand side."  (Dawson Dep. 22.)[4]  Later that day, Plaintiff was taken to a hospital because the pain in his sinus area was intense.  He was admitted for a tooth abscess with an elevated blood sugar level.  (Gevers Ltr. 2.)

Plaintiff received a written reprimand from his supervisor, Lieutenant Guy, for each of these two incidents.  (Dawson Dep. 18, 25-26; *see also* July 11 Reprim. Ltr.; July 25 Reprim. Ltr., Def.'s Mot. Ex. I.)  With respect to the first incident, the July 11, 2008 reprimand letter stated that "[i]t has been determined that the resulting accident which [the pursuing officer] and [Plaintiff] were involved in was precipitated by [Plaintiff] not giving [the other officer] a safe distance to travel."  (July 11 Reprim. Ltr.)  The letter noted Plaintiff's previous record of safe driving and requested that Plaintiff attend an eight-hour course on driving.  (*Id.*)  With respect to the second incident, the July 25, 2008 reprimand letter stated that Plaintiff's "conduct is unacceptable and considering [he] just finished drivers training for a past accident, harsher correction methods will be employed if it happens again."  (July 25 Reprim. Ltr.)

As a result of his hospitalization on July 25, 2008, Plaintiff missed one day of work. (Dawson Dep. 28.)  After his release from the hospital, Plaintiff went on a previously-scheduled two-week vacation.  (*Id.* at 29, 32.)  At this point, Defendant became concerned about Plaintiff's health and its impact on his participation as a patrol officer.  (Guy Dep. 13-14.)

When Plaintiff returned to work on August 5, 2008, his supervisor at the time, Peter Ray,

---

[4] Guy testified that after this incident, Plaintiff appeared "dazed" and incoherent.  (Guy Dep. 17; *see also* Smythe Dep. 26.)  Guy believes that this incident was "diabetes-related," based on information he received from others.  (Guy Dep. 19-20.)  Plaintiff disputes this assertion. (Pl.'s Resp. ¶ 54.)

informed him that he could not return to work until he brought in a doctor's note.  (Dawson Dep.

26, 29, 33.)  Plaintiff provided to Defendant a note from his doctor within a week of the request.

(*Id.* at 29.)  The note is on the letterhead of, and signed by, Dr. Mario Littman, M.D., F.A.C.P.,

the doctor who treated Plaintiff for the tooth abscess.  (Dawson Dep. 31; *see also* Dr.'s Note,

Pl.'s Resp. Ex. B.)  The note is not dated and states that "Charles Dawson was hospitalized on

07/25/08-07/27/08 at Mercy Fitzgerald Hospital for an abscess of the upper gum.  Dawson is able

to return back to work."  (Dr.'s Note.)  After Plaintiff provided the note to Defendant, he was still

not permitted to return to work.  (Dawson Dep. 34.)  When Plaintiff asked Lieutenant Guy why

he was not allowed to return to work, Guy told him not to worry and that he would "take care of

it."  (*Id.* at 35.)  When Plaintiff asked Corporal Baker the same question, Baker responded that he

did not know anything about it.  (*Id.* at 36.)  In August 2008, Plaintiff's employment with the

Darby Borough Police Department ended.  (*Id.* at 20-21.)

   Sometime before December 2008, Plaintiff filed a grievance with the union with regard to

his not being permitted to return to work.  (*Id.* at 38-41.)  In December 2008, the union

representative, Tim Baker, set up a meeting with Plaintiff, Skip Miller, the attorney for the

Fraternal Order of Police, and the union president at the time, to discuss Plaintiff's grievance.

(*Id.* at 38.)  At the meeting, the individuals discussed Plaintiff taking a deal in which he would

receive a non-service-connected disability pension.  (*Id.* at 40-41.)[5]  The pension would provide

---

[5] A non-service-connected disability pension can be awarded to an officer who can no longer perform his duties as a police officer as a result of something that was not service-connected or has nothing to do with police work.  (Smythe Dep. 9.)

  In determining eligibility for a disability pension, the Chief makes the initial determination.  The determination is then sent up the chain of command to the Borough Council, which considers doctor evaluations and input from the solicitor and others, including an insurance consultant and/or a pension consultant.  (*Id.* at 9-13, 37.)  The police officer seeking

Plaintiff with 50 percent of his wages and 100 percent of his medical benefits.  (Dawson Dep. 42; *see also* Pension Plan, Def.'s Mot. Ex. E.)  In response to this offer, Plaintiff asked, "What does that have to do with me coming back to work?"  (Dawson Dep. 43.)  It was suggested to Plaintiff that he take the deal.  (*Id.*)  After 45 minutes to an hour of discussion, Plaintiff agreed to take the non-service-connected disability pension.  (*Id.* at 44.)  When Plaintiff left the building and walked to his car, he did not "feel right" about taking the deal.  As a result, he returned to the office and spoke to Miller in a one-on-one conversation.  He asked Miller again why he was not permitted to come back to work.  Miller responded that it was because of his diabetes.  (*Id.*)

Sometime before December 18, 2008, a meeting was held between Mark Possenti, the Manager/Secretary of Defendant, Arthur J. Gallagher, Defendant's insurance broker, Raymond Santarelli, Defendant's solicitor, and the individual who runs Defendant's pension plan (collectively, the "Committee").  (Possenti Dep. 10-13, Pl.'s Resp. Ex. D.)[6]  At the meeting, the Committee discussed Plaintiff's performance as a police officer and whether he would be eligible for a non-service-connected disability pension.  (Possenti Dep. 11.)  Among the topics discussed was Plaintiff's diabetes.  (*Id.* at 12-13.)[7]

The decision to terminate a police officer's employment can only be made by vote of the Borough Council.  (Possenti Dep. 14.)  By letter of December 18, 2008 from Possenti, Plaintiff's

---

the pension must provide his medical records from his treating physicians.  (*Id.* at 13.)  However, Plaintiff contends that he was never told that he was being considered for a disability pension and was never informed of any expected involvement in the process for determining his eligibility for the pension.  (Pl.'s Resp. ¶ 35.)

[6] Smythe testified that the Committee included himself, Santarelli, the Mayor, and to the best of his recollection, two other individuals.  (Smythe Dep. 20.)

[7] Plaintiff asserts that these topics were not discussed with him.  (Pl.'s Resp. ¶ 58.)

employment with the Darby Borough Police Department was terminated.  The letter stated:

> Our review of your current medical condition indicates that you are not capable of performing the full scope of duties as a sworn Police Officer.  In addition, your condition is not work-related and is permanent.
>
> Accordingly effective February 1, 2009, your employment with the Borough of Darby is officially terminated.  You will be charged personal time (holidays, vacation, sick) until February 1, 2009.  You may be eligible for Non-Service Connected Disability Pension benefits.  You should take the necessary steps to apply for these benefits at your earliest convenience.

(Dec. 18 Ltr., Pl.'s Resp. Ex. E.)  This letter was the result of the meeting held by the Committee.

(Possenti Dep. 10.)  Smythe testified that the Committee was concerned that Plaintiff was a liability not only to himself, but also to Defendant, with respect to his ability to perform the job of a police officer on patrol duty.  (Smythe Dep. 19-20.)  The concern stemmed from the two incidents in 2008 for which Plaintiff was disciplined.  (*Id.* at 20.)  Plaintiff received the December 18 letter prior to any vote by the Borough Council to terminate his employment.

(Possenti Dep. 21.)  Accordingly, the termination set forth in the December 18 letter was not official.  (*Id.*)

By letter of February 4, 2009, Miller confirmed to Possenti that, "[p]ursuant to [the] letter of December 18, 2008 directed to Officer Charles Dawson, this will confirm that" Plaintiff

> will agree to an honorable discharge from police service, effective February 1, 2009 (or any subsequent date thereafter) with the understanding/agreement that the Borough will contemporaneously place [Plaintiff] upon permanent non-service connected disability pension as specified in the collective bargaining agreement between the Borough and the FOP and that [Plaintiff] will be provided any and all contractual at-retirement and post-retirement benefits.

(Feb. 4 Ltr., Pl.'s Resp. Ex. F.)  Plaintiff received this February 4 letter shortly after that date.

(Dawson Dep. 47-48.)  After receiving this letter, Plaintiff went to Miller's office, where he was

presented with documents related to the non-service-connected disability pension.  (Dawson Dep. 51-52.)  Plaintiff refused to sign the documents because he "didn't feel right about it."  (*Id.* at 53.)  Subsequently, in a telephone conversation, Lieutenant Guy requested that Plaintiff sign the documents.  Plaintiff explained to the Lieutenant that he "didn't feel right about signing the papers" and that he retained a lawyer and would "go from there."  (*Id.* at 53-54.)

On February 18, 2009, the Borough Council approved Plaintiff's non-service-connected disability pension.  (Council Mins., Def.'s Mot. Ex. F; Smythe Dep. 50.)  Plaintiff has never signed the documents necessary to obtain the non-service-connected disability pension.  (Dawson Dep. 56.)  In addition, at the time of his deposition, Plaintiff had not yet been made aware that the Borough Council had approved the pension for him.  (*Id.* at 50.)  Plaintiff contends that he was capable of working as a police officer before he was terminated and is capable of working as a police officer today.  (*Id.* at 86-87.)

Since being terminated in August 2008, Plaintiff has worked odd jobs, including cutting grass, fixing a car and moving furniture.  (*Id.* at 61-62.)  In 2010, Plaintiff began searching for employment.  Plaintiff has applied for employment with several different employers, including employment as a mechanic and as a security officer with the Delaware River Port Authority.  (*Id.* at 85.)  He also has applied for employment with the Delaware County Sheriff's Office.  He believes that he can work as the deputy sheriff or bailiff.  (*Id.* at 84-85.)[8]

Since being terminated, Plaintiff has been hospitalized on two other occasions.  In 2009, he experienced a diabetic attack and passed out in his apartment.  Later that year, he was

---

[8] Plaintiff clarified that he "applied to" the Sheriff Department by picking up an application the week before his deposition.  At the time of his deposition, he had not filled out the application.  (Dawson Dep. 84-85.)

hospitalized because he had been overcome by heat.  (Dawson Dep. 69-71.)

Guy testified that Plaintiff was a "good officer" while employed by Defendant to the extent that he did not cause many citizen complaints or problems, but that Plaintiff, at times, struggled with decision-making as required for the job of patrol officer.  (Guy Dep. 9.)  Smythe testified that Defendant did not terminate Plaintiff because of diabetes.  Rather, he was terminated because of a concern about a liability issue, due to his inability to perform his duties as a police officer in a safe manner.  This made Plaintiff a danger to himself and the public. (Smythe Dep. 40-42.)

Plaintiff filed the instant Complaint on November 3, 2010, asserting two Counts. (Compl., ECF No. 1.)  Count I alleges disability discrimination in violation of the ADA.  (*Id.* at ¶¶ 31-34.)  Count II alleges failure to accommodate for a disability in violation of the ADA.  (*Id.* at ¶¶ 35-37.)  Defendant answered the Complaint on December 29, 2010.  (Answer, ECF No. 5.) On April 6, 2011, the parties entered into a stipulation dismissing without prejudice Count II of the Complaint.  (Dism. Stip., Def.'s Mot. Ex. A.)  Defendant filed the instant Motion for Summary Judgment on October 21, 2011.  (Def.'s Mot.)  Plaintiff filed a response opposing the Motion on November 10, 2011.  (Pl.'s Resp.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmovant bears the burden of proof on a particular issue at trial, the movant's initial burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmovant fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Plaintiff Is Not Judicially Estopped From Asserting a Discrimination Claim

Defendant contends that Plaintiff is judicially estopped from asserting a discrimination claim because his attorney advised Defendant that Plaintiff would accept the pension two months after the meeting between Plaintiff and his attorney.  Defendant asserts that this "indicate[s] a period of deliberation on the part of the Plaintiff to accept his non-service connected disability pension."  (Def.'s Br. 3-4, ECF No. 11.)  Plaintiff contends that judicial estoppel does not apply. (Pl.'s Resp. 7-9.)

Judicial estoppel bars a litigant from asserting a position that is inconsistent with one he

or she previously took before a court or agency.  *Montrose Med. Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).  Three requirements must be met before a court may apply judicial estoppel:  (1) "the party to be estopped must have taken two positions that are irreconcilably inconsistent"; (2) "the party changed his or her position 'in bad faith - i.e., with intent to play fast and loose with the court'"; and (3) "it is 'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct."  *Id.* at 779-80 (internal citations omitted).  Once an inconsistency has been established, the party to be estopped must explain it.  *Motley v. New Jersey State Police*, 196 F.3d 160, 166 (3d Cir. 1999) (citing *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 800 (1999)); *see also Veneziano v. Long Island Pipe Fabrication & Supply*, 79 F. App'x 506, 509 (3d Cir. 2003).

In this case, Plaintiff did not initially accept the offer for the pension.  Rather, Plaintiff kept asking why he was not permitted to return to work.  (Dawson Dep. 43.)  Plaintiff agreed to take the pension only after 45 minutes to an hour of persuasion by the other attendees at the grievance meeting.  (*Id.* at 44.)  When Plaintiff left the building and walked to his car, he did not "feel right" about taking the deal.  As a result, he returned to the office shortly after leaving the meeting and attempted to revoke his agreement.  (*Id.*)  When Plaintiff was presented with documents finalizing his acceptance of the pension, Plaintiff refused to sign them on ground that he "didn't feel right about signing the papers."  (*Id.* at 52-54.)  Plaintiff still has not signed the papers.  (*Id.* at 56.)  These actions by Plaintiff are not "irreconcilably inconsistent."  In light of the fact that Plaintiff attempted to withdraw his agreement to take the pension only minutes after accepting it, it can hardly be said that Plaintiff committed to a certain position.  Nor do Plaintiff's

actions indicate bad faith.  Plaintiff accepted the pension during the meeting only after being pressured by the other attendants and, within minutes, attempted to revoke the agreement.

The cases cited by Defendant in support of its contention that judicial estoppel should apply are inapposite.  In *Cleveland v. Policy Management Systems Corp.*, the plaintiff made a contradictory sworn assertion in an application for disability benefits.  526 U.S. at 806.  Similarly, the plaintiff in *Motley v. New Jersey State Police* averred that he was "permanently and totally disabled" when applying for disability benefits and failed to offer a reasonable explanation to explain away the inconsistency.  196 F.3d at 166.  In *Persinger v. Delmar School District*, No. 02-1447, 2004 WL 1534746 (D. Del. July 8, 2004), the plaintiff had represented in a prior application that she was qualified for disability benefits due to an inability to perform "all educationally related responsibilities," and that "no duty [was] possible."  *Id.* at *4-5.  In *Lincoln v. Momentum Systems Ltd.*, the plaintiff made assertions that he was unable to work in order to receive disability benefits.  86 F. Supp. 2d 421, 430 (D.N.J. 2000).  No such statements or application for disability benefits were made here.  Indeed, Plaintiff repeatedly asked Defendant why he was not allowed to return to work and believes that he was and is capable of working as a police officer.  Accordingly, judicial estoppel does not bar Plaintiff's ADA claim.

      **B.**      **Plaintiff Has Not Established an ADA Claim Because He Cannot Show That He Was "Disabled" Within the Meaning of the ADA**

"The ADA prohibits covered employers from discriminating against disabled individuals" on the basis of their disability.  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (citing 42 U.S.C. § 12112(a)); *see also* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability.").  "To establish a prima

facie case of discrimination" in violation of the ADA, "a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination."  *Sulima*, 602 F.3d at 185 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

To succeed on his claim that he was terminated from his position with the Darby Borough Police Department in violation of the ADA, Plaintiff must establish that he was disabled as that term is defined by the ADA.  The ADA provides that an individual has a disability if he has (i) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (ii) "a record of such an impairment," or (iii) is "regarded as having such an impairment."  42 U.S.C. § 12102.  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  Moreover, a plaintiff is "regarded as" having a disability if he

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir. 1999) (alteration in original) (quoting 29 C.F.R. § 1630.2(l) (1996)).

Plaintiff denies that he is disabled to the extent he cannot perform his job duties.  (Pl.'s

-13-

Resp. 2.)  Plaintiff contends that Defendant regarded him as disabled.  (*See* Compl. ¶¶ 33-34 (asserting that Defendant mistakenly believed that Plaintiff's diabetes substantially limited his ability to perform his job as a police officer).)  Plaintiff alleges that he was terminated from his position as a police officer because Defendant believed that his diabetes significantly limited a major life activity, namely, his ability to work.  (Pl.'s Resp. 5.)

In a "regarded as" case, the analysis "focuses not on [the plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him." *Kelly v. Drexel Univ.*, 94 F.3d 102, 108–09 (3d Cir. 1996).  "[I]n general, an employer's perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim." *Pathmark Stores, Inc.*, 177 F.3d at 188.  However, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled . . . ." *Kelly*, 94 F.3d at 109.  "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).  In other words, a plaintiff must demonstrate that he was regarded as being "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* at 492.  Thus, "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.*

Defendant contends that Plaintiff is not precluded from working in a class of jobs or a broad range of jobs in various classes.  (Def.'s Br. 6-7.)  Defendant contends that while it may

have regarded Plaintiff as unable to perform the functions of a police officer, it did not regard him as "disabled" since he was capable of performing other jobs.  Defendant asserts it just did not have other jobs available to him.  (*Id.* at 7.)

The evidence shows only that Defendant believed that Plaintiff's diabetes substantially limited his ability to safely perform the tasks required of a police officer.  Plaintiff's claim that Defendant regarded him as being substantially limited in the major life activity of working fails because there is no evidence that Plaintiff was unable to work a broad class of jobs.  Plaintiff points out that Defendant perceived diabetes as causing him to fall asleep at work and to be tired, and causing him to become involved in two car accidents within a short period of time and to be dazed, confused and incoherent at times.  (Pl.'s Resp. 6.)  However, these perceptions relate solely to Plaintiff's ability to perform the duties of a police officer and do not reflect a judgment as to whether Plaintiff was capable of performing other jobs.  *See Cetera v. CSX Transp., Inc.*, 191 F. App'x 151, 152 (3d Cir. 2006) (finding plaintiff not substantially limited in the major life activity of working because plaintiff failed to establish that defendant regarded him as unable to perform any job other than that of freight conductor); *Lewis v. Genesis Healthcare Corp.*, No. 10-2935, 2011 WL 5041348, at *6 (E.D. Pa. Oct. 24, 2011) (finding that plaintiff failed to establish that her thyroid condition substantially limited the major life activity of working because she alleged only that the condition prevented her from performing certain tasks as a licensed practical nurse at a nursing facility); *Leitch v. MVM, Inc.*, 538 F. Supp. 2d 891, 901 (E.D. Pa. 2007) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") (internal quotation marks and citations omitted).  These perceptions were confirmed in the December 18, 2008 letter notifying Plaintiff

-15-

of his termination.  In this letter, Defendant stated that "[o]ur review of your current medical condition indicates that you are not capable of performing the full scope of duties as a sworn Police Officer."  (Dec. 18 Ltr.)

In the case of *Lewis v. Pennsylvania*, an applicant for the position of state trooper brought a disability discrimination lawsuit against the Commonwealth of Pennsylvania and the state police.  609 F. Supp. 2d 409 (W.D. Pa. 2009).  The applicant alleged that the defendants discriminated against him on the basis of his Type II diabetes, in violation of the ADA, Rehabilitation Act and state law, when he was not accepted into the state cadet program that trained individuals to become state troopers.  *Id.* at 413.  The district court granted the defendants' motion for summary judgment because it found that the applicant was not regarded as disabled within the meaning of the ADA or Rehabilitation Act.  *Id.* at 411, 418.

In *Lewis v. Pennsylvania*, the evidence demonstrated that the defendants disqualified the applicant only for "a single, narrow position:  cadet or Pennsylvania State Trooper."  *Id.* at 418.  The defendants found him unqualified because of an "assessment that [the applicant's] diabetes was uncontrolled and that he faced the risk of hypoglycemia."  *Id.*  This, combined with the fact that the state trooper position imposed "specific demands" and that "the risk of a hypoglycemic episode could pose safety concerns for the Trooper and the public" warranted the applicant's disqualification.  *Id.* at 418-19.[9]  Moreover, the court noted that there was no evidence that the

---

[9] The "specific demands" of the position included that:  (i) troopers are required to work rotating shifts and are often required to work extended shifts and overtime; (ii) regular mealtimes and opportunities for self-testing are not always possible; (iii) police work is inherently unpredictable and sometimes dangerous; and (iv) "[a]ny condition that can quickly render a police officer confused or unconscious could put that trooper, fellow troopers, or the public in danger."  *Pennsylvania*, 609 F. Supp. 2d at 419.

defendants regarded the applicant as disabled from working in a class of jobs or in a broad range

of jobs in a class.  At most, the evidence demonstrated only that the defendants regarded Plaintiff

"as unable to perform the single, specific job of cadet or state trooper." *Id.* at 419.  The

defendants' concerns tied specifically to the "singular position of cadet or Pennsylvania State

Trooper." *Id.*

       The facts in this case are almost identical to the facts in *Lewis v. Pennsylvania*.  During a

meeting in which Plaintiff's eligibility for a pension was discussed, the Committee was

concerned that Plaintiff was a liability to not only himself, but also Defendant, with respect to his

ability to perform the job of a police officer.  (Smythe Dep. 19-20.)  Smythe testified that

Plaintiff was terminated because of a concern about a liability issue, due to his inability to

perform his duties as a police officer in a safe manner.  (*Id.* at 40-42.)  As in *Lewis v.

Pennsylvania*, at most, the evidence here shows that Defendant regarded Plaintiff "as unable to

perform the single, specific job of cadet or state trooper." *Pennsylvania*, 609 F. Supp. 2d at 419.

Thus, Plaintiff cannot demonstrate that Defendant regarded him as disabled from more than a

particular job, that of a police officer.

       Plaintiff contends that the average person with Plaintiff's skill and training is qualified to

work manual labor jobs, particularly police and security-related jobs; that Defendant perceived

Plaintiff's diabetes as preventing him from doing his job as a police officer; and therefore, that

one could reasonably find that Defendant believed that Plaintiff's diabetes prevented him from

performing a class of jobs, given his skill and training.  (Pl.'s Resp. 6-7.)  To the extent that

Plaintiff asserts that the job of a police officer is a "class of jobs" or "broad range of jobs within a

class," Plaintiff is simply wrong.  The cases holding otherwise are legion.  *See Pennsylvania*, 609

F. Supp. 2d at 419; *see also Rossbach v. City of Miami*, 371 F.3d 1354, 1361 (11th Cir. 2004) (concluding that the job of "police officer" is not a broad range or class of jobs) (collecting cases from other circuits); *Van v. Miami-Dade County*, 509 F. Supp. 2d 1295, 1301 (S.D. Fla. 2007) (concluding that position of "correctional officer" constitutes a "single, particular job, which cannot constitute a substantial limitation of the major life activity of working"); *Harman v. Rafferty*, No. 04-2027, 2005 WL 3285980, at *7 (M.D. Pa. July 26, 2005) (holding that "police officer" was not a class of jobs, but rather was the plaintiff's chosen profession).

Plaintiff cites *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426 (3d Cir. 2009), for the proposition that an employer's belief that a plaintiff's medical condition would prevent her from performing her job is sufficient to support an ADA claim.  (Pl.'s Resp. 4.)  Plaintiff construes *Eshelman* too broadly.  In *Eshelman*, the plaintiff was a supervisor of the Chief Information Office of the defendant, a component manufacturing company.   From time to time, as part of the job, the plaintiff was required to drive to unfamiliar places.  The plaintiff developed cognitive dysfunction as a result of chemotherapy treatment for her breast cancer.  When she returned to work, she was able to cope with her memory deficiencies and generally performed the job well. The defendant company later suffered a substantial decline in profitability and implemented a company-wide reduction in force.  *Eshelman*, 554 F.3d at 430-31.  The idea of a transfer to a different facility in the area was broached to the plaintiff.  The plaintiff expressed concerns about traveling to new locations in light of her memory problems.  *Id.* at 431.  These concerns were discussed with management.  As a result, the plaintiff's grading score was lowered from one of the highest scores to one of the lowest.  The score was lowered because of the defendant's perception that the plaintiff would be unable to travel to the defendant's nearby sites, a limitation

-18-

that was attributed to the plaintiff's chemotherapy, as well as the belief that the plaintiff lacked "the ability to perform the job in [defendant's nearby sites]."  Plaintiff was laid off and subsequently brought an ADA suit against the defendant.  *Id.* at 432.

At issue was whether the plaintiff offered sufficient evidence from which the jury could have reasonably concluded that the defendant regarded her as disabled.  *Id.* at 434.  The defendant argued that the evidence demonstrated, at most, that it perceived that the plaintiff's chemotherapy rendered her unable to drive or to commute to work, and because driving is not a major life activity, the plaintiff could not show that the defendant regarded her as being unable to perform a major life activity.  The court rejected the defendant's argument because the plaintiff's inability to drive was not the only reason why the defendant decided to lower its grading score of plaintiff.  *Eshelman*, 554 F.3d at 435.  The other reasons included concerns about the plaintiff's "ability to perform the job" in other towns following the defendant company's restructuring.  The court held that the jury could reasonably infer that the defendant's concerns were broader, extending to the plaintiff's ability to perform any job at the defendant company following the planned restructuring.  *Id.*

*Eshelman* is easily distinguished from the instant case.  In this case, there is no evidence that Defendant regarded Plaintiff as unfit for a class of jobs or a broad range of jobs in various classes.  The evidence shows that Defendant viewed Plaintiff as unable to perform his job as a police officer, specifically.  Unlike the facts in *Eshelman*, there is no evidence here that Defendant's concerns were broader, extending to Plaintiff's ability to perform *any* job.  *See id.* at 436 (refusing to disturb verdict to the extent based on a "regarded as" disabled theory because there was evidence "that [the defendant] slated [the plaintiff] for termination based on its

perception . . . that [the plaintiff's] cancer-related memory problems rendered her unfit for *any*

*job* in [defendant's] restructured workforce") (emphasis added).  Moreover, as discussed above,

the job of a police officer is not a class of jobs or a broad range of jobs within a class.  Thus,

regarding an employee as unable to be a police officer is vastly different from regarding an

employee to be unable to perform any job at a components manufacturing company.

Plaintiff has failed to demonstrate that he is disabled or regarded as disabled within the

meaning of the ADA.  Since Plaintiff has not established a prima facie case of discrimination in

violation of the ADA, Defendant's Motion must be granted.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

An appropriate Order follows.


**BY THE COURT:**


_____

**R. BARCLAY SURRICK, J.**